## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

-----------------------------------------------------x

MARY FAY,                 :
                                 :
         **Plaintiff,**        :
                                 :     **Case No.:  3:16-cv-1291 (   )**
**v.**                                 :
                                 :
**VOYA FINANCIAL, INC.**       :
                                 :
         **Defendant.**       :     **JULY 29, 2016**

-----------------------------------------------------x

## COMPLAINT

### I.    INTRODUCTION

1.    The plaintiff, Mary Fay, brings this whistleblower retaliation case against the successor to her former employer, ING USA Annuity and Life Insurance Company.  She brings her claim under the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6; the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A; and Connecticut's free speech anti-retaliation statute, Conn. Gen. Stat. § 31-51q.

### II    THE PARTIES

2.    The plaintiff, Mary Fay, is a natural person and a citizen of Connecticut.

3.    At all relevant times discussed herein, Ms. Fay's former employer, ING USA Annuity and Life Insurance Company ("ING"), was a subsidiary of ING U.S., Inc., itself a subsidiary of ING Group, N.V., its Dutch parent company.  ING U.S., Inc. at all relevant times discussed herein was a company or a subsidiary of a company with a class of securities registered under § 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78*l* ("the Act"), and was at all relevant times discussed herein required to file reports under § 15(d) of the Act, *id.* § 78*o*(d).

4.      In or about May 2013, ING U.S., Inc. conducted an initial public offering

("IPO").  Following the IPO, ING USA Insurance and Annuity Company became known as

Voya Insurance and Annuity Company, and became a subsidiary of a newly created entity, Voya

Financial, Inc. ("Voya").  Voya is a publicly-traded corporation doing business throughout the

United States.  Voya is a company with a class of securities registered under § 12 of the Act,

15 U.S.C. § 78*l*, and was and is at all relevant times discussed herein required to file reports

under § 15(d) of the Act, *id.* § 78*o*(d).

## III.     JURISDICTION AND VENUE

5.      This Court has jurisdiction over the plaintiff's federal law claims pursuant to

28 U.S.C. § 1331.  This Court has supplemental jurisdiction over the plaintiff's Connecticut state

law claim pursuant to 28 U.S.C. § 1367, since that claim is so related to her federal law claims

that they form part of the same case or controversy.

6.      Venue is proper within this District, pursuant to 28 U.S.C. § 1391(b)(2), because a

substantial part of the events or omissions giving rise to the claims occurred in this District.

## IV.     ADMINISTRATIVE EXHAUSTION

7.      The plaintiff filed a complaint pursuant to the Sarbanes-Oxley Act of 2002,

18 U.S.C. § 1514A, with the U.S. Department of Labor ("DOL") on April 17, 2014.

8.      The DOL complaint was filed in a timely manner insofar as it was filed within

180 days of the date that the plaintiff received notice of her termination.

9.      The plaintiff received a right to sue letter from the DOL, dated January 5, 2015.

10.     The plaintiff timely withdrew her unresolved complaint from the DOL insofar as

it was pending in the DOL for more than 180 days.

V.      **FACTUAL ALLEGATIONS**

      A.      **ING Recruits Ms. Fay Based on Her History of Accomplishment.**

11.     Mary Fay holds a Bachelor of Science degree in business from Skidmore College, where she focused on accounting, and a Master of Business Administration from Rensselaer Polytechnic Institute.  She also completed an Executive Leadership training course at Harvard University.

12.     Prior to her hire by ING, Ms. Fay worked as a Senior Annuity Product Manager at The Hartford; Director of Annuity Product Management at CIGNA; Senior Director of Product Management and Marketing in Annuities at Travelers; Senior Vice President of Variable Annuities at GE Financial; Site President and Head of Operations for GE Financial Group Insurance; and Senior Vice President and General Manager of Annuities at Sun Life Financial.

13.     Among her accomplishments, Ms. Fay has held Series 6 and Series 26 securities licenses; was an annuity product patent holder at GE Financial; served on the Board of Overseers of Newton Wellesley Hospital; and was recognized by the Hartford Business Journal as a Remarkable Woman in Business.

14.     During Ms. Fay's career, her responsibilities regularly included ensuring that financial information contained in documents filed with the U.S. Securities and Exchange Commission ("SEC") complied with the American Academy of Actuaries Code of Conduct, the Actuarial Standards Board's Actuarial Standards of Practice ("ASOPs"), and Generally Accepted Accounting Principles ("GAAP").

15.     ING recruited Ms. Fay, and ultimately hired her on January 3, 2012, as its Senior Vice President, Head of Product, Annuities.

16.     Ms. Fay was recruited by Mary Elizabeth ("Maliz") Beams, Chief Executive Officer, Retirement Services, and Michael Smith, the then-Chief Executive Officer of Annuities, and was hired by Mr. Smith, to whom she reported.  Ms. Beams told Mr. Smith that Ms. Fay would be a great addition to the ING team, that she knew the industry well, and that she could execute successfully.  Ms. Beams told Ms. Fay that Mr. Smith; Robert Leary, the President and Chief Operating Officer; and she all thought very highly of Ms. Fay.  Indeed, when Ms. Beams met with Ms. Fay on numerous occasions, Ms. Beams told Ms. Fay: "I told Mike Smith to hire you right away."

**B.      <u>Ms. Fay Excels at ING.</u>**

17.     Throughout her employment with ING, Ms. Fay performed her job in an exemplary manner and was consistently recognized as an exceptional contributor to ING.

18.     In early May 2012, Ms. Fay spoke on the topic of business collaboration at the annual meeting of the ING U.S. Leaders Council, which is the top 100 executives of ING U.S. Mr. Leary invited Ms. Fay to give the talk; the invitation was communicated to Ms. Fay by Mr. Smith.

19.     By July 2012, Ms. Fay's performance resulted in ING promoting her.  She became Head of Annuities and a member of the Senior Leadership Team.  She reported directly to Ms. Beams, the newly-installed CEO of ING Retirement Solutions.

20.     Ms. Beams communicated the promotion to Ms. Fay over dinner on July 11, 2012.

21.     On July 13, 2012, Ms. Beams emailed Ms. Fay to say that she "[]re[]ally enjoyed our dinner…..We are going to have to repeat that soon!  I'm so thrilled you are on board….it will be a very exciting time (and with minimal commuting…yes!)[.]"

4

22.     Prior to July 2012, Ms. Fay had been commuting five hours from her home in Connecticut to work in ING's West Chester, Pennsylvania office Monday through Thursday. Ms. Fay stayed in a hotel on Monday, Tuesday, and Wednesday nights.

23.     As part of the offer for Ms. Fay to become Head of Annuities, Ms. Beams told Ms. Fay that she could work from ING's Windsor, Connecticut office or "you can work from home, for all I care."

24.     On July 17, 2012, at a Senior Leadership meeting, Ms. Beams publicly announced Ms. Fay's selection as Head of Annuities and a member of the Senior Leadership Team. Ms. Fay was welcomed and congratulated by those present.

25.     In August 2012, Ms. Beams informed Ms. Fay that ING was going to conduct a search for the Head of Annuities position, though she encouraged Ms. Fay to apply as an internal candidate.

26.     Throughout this time, Ms. Fay had regular professional and personal contact with Ms. Beams and Mr. Smith, as well as with other senior leaders at ING.

27.     Prior to November 2012, Ms. Fay was a primary designer of the Annuities presentation that Ms. Beams gave to the lead bankers involved in ING's impending initial public offering of stock in "Voya Financial."  Following the presentation, in November 2012, Ms. Beams emailed Ms. Fay to tell her that she "did a great job pulling it together for the bankers, analysts, and rating agencies…..!"

28.     In December 2012, Ms. Beams told a senior human resources leader at ING that Ms. Fay was "doing a great job in [her] current role and adding value" for the organization.

29.     Also in December 2012, Ms. Beams left Ms. Fay a voicemail wishing Ms. Fay happy holidays and reiterating that Ms. Fay was doing a great job.

30.    On January 3, 2013, Ms. Beams emailed Ms. Fay concerning Ms. Fay's first anniversary at ING.  Ms. Beams wrote: "Happy 1st year anniversary at ING…..  Here's to many, many more!"

**C.    Ms. Fay and Her Team Prepare Initial Projections of Returns on Equity ("ROE") Relevant to the Voya Lifetime Income Annuity, a New Product Being Considered for Market.**

31.    In or about 2012, a decision was made to "spin off" ING U.S. from its Dutch parent corporation and incorporate it as a publicly traded company in the United States under the name "Voya Financial" ("Voya").

32.    The corporate reorganization required the new company to make an initial public offering ("IPO") of its stock to the investing public.  The IPO was required to be done pursuant to the statutes, rules, and regulations governing the issuance of securities to the public, as promulgated and established by Congress and the SEC.

33.    Among the statutory and regulatory requirements for an issuer of securities is the requirement that the information contained in the required public filings with the SEC be truthful, accurate, complete, and not misleading to prospective investors with respect to the offered securities.  *See, e.g.*, 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b).

34.    Part of the information to be contained in the required public filings for Voya's IPO was a description of a new annuity product to be known as "Voya Lifetime Income Annuity" (hereinafter "the Product").

35.    Voya's projections regarding the expected financial performance of the Product would impact Voya's description in the required public filings of the expected financial performance of its Annuities segment.

6

36.     In or about January 2013 through February 2013, as part of the process of deciding whether the newly-formed company would market the Product, Ms. Fay and her team of actuaries in Annuities were tasked with calculating the Product's anticipated profitability to the company.  These calculations would influence how "Fixed Income Annuities," a Voya product group which included this Product, would be described in the required public filings with the SEC, on which public filings Voya intended prospective investors to rely.

37.     Ms. Fay had substantial experience in making and supervising these types of calculations.

38.     Among the metrics to be calculated for the Product were the projected periodic Returns on Equity ("ROE").  Generally speaking, the higher the ROE, the more likely the Product would be profitable for the company, and thus the more attractive the company's stock would be to potential investors.

39.     On or about February 10, 2013, Ms. Fay and her team of actuaries calculated the ROE for the Product, utilizing existing and accepted actuarial and accounting methods which had been long recognized as the appropriate methodology in the financial industry for calculating ROEs and had been previously approved by regulators, auditors, and internal ING executive management.

40.     Specifically, in calculating the ROE for the Product, Ms. Fay and her team of actuaries followed the American Academy of Actuaries Code of Conduct, as well as Actuarial Standards of Practice ("ASOPs") promulgated by the Actuarial Standards Board.

41.     The Actuarial Standards Board ("the Board") establishes standards of practice for actuaries in the United States.

42.      As characterized by the Board, these Actuarial Standards of Practice "serve to assure the public that actuaries are professionally accountable."  The standards protect the public by "indicating for various areas of actuarial practice the appropriate procedures, techniques, and approaches, thereby enhancing the public's trust in the credibility and completeness of actuarial work product."

43.      On January 28, 2013, David Bedard began working at ING as the new President of Annuities and became Ms. Fay's immediate supervisor.

44.      On or about February 15, 2013, at a meeting with Mr. Bedard, Ms. Beams, and Mr. Smith, Ms. Fay presented the high-level financials of the Product for approval.  The ROE calculations Ms. Fay presented to her superiors were cumulative; they did not include ROE calculations for individual years.

45.      In response, Mr. Smith told Ms. Fay that he wanted to see ROE calculations for individual years.

46.      Over the next several days, Ms. Fay and her team of actuaries prepared more specific calculations to reflect the Product's annual ROEs, as requested by Mr. Smith.

47.      In performing these calculations, Ms. Fay and her team of actuaries followed Generally Accepted Accounting Principles ("GAAP"), which are recognized as providing the accepted methodology for financial reporting.

48.      Accordingly, Ms. Fay and her team of actuaries referred to these annual ROE calculations as "GAAP ROE Trajectory."

49.      In performing these calculations, Ms. Fay and her team of actuaries utilized an existing and previously approved and vetted ING model called the "Aggregate GAAP ROE model."

50.     The GAAP ROE Trajectory showed that the ROE for the Product's first year was 7.0%.

51.     Based on her substantial prior experience in making and supervising this exact metric for annuity products, Ms. Fay reasonably believed that the GAAP ROE Trajectory would influence the language and content of ING's public filings with the SEC in connection with the IPO of Voya.

**D.     Ms. Fay's Superiors at ING Instruct Her to Artificially Inflate the GAAP ROE Trajectory.**

52.     On February 21, 2013, Ms. Fay sent via email a memorandum to Mr. Smith, Ms. Beams, and Mr. Bedard, among others.  The memorandum outlined the 20-year GAAP ROE Trajectory of the Product.  The memorandum included the 7.0% ROE for the Product's first year.

53.     Mr. Smith responded to the memorandum by email.  In his email, Mr. Smith said that the ROE was "not overly exciting given that it [was] pretty heavily backloaded."  Mr. Smith added that "[he]'d be more focused on the ROE over the first 5-10 years, which [was] consistently low 7's."

54.     Ms. Fay understood Mr. Smith's email to be a direction that an ROE of "low 7's" for "the first 5-10 years" of the Product was too low and should be higher.

55.     On Friday, February 22, 2013, Mr. Bedard told Ms. Fay that Ms. Beams had told Mr. Bedard that she was dissatisfied with the GAAP ROE Trajectory for the Product's "early years."  Mr. Bedard then instructed Ms. Fay to "rework" the GAAP ROE Trajectory of the Product in order to make the ROE higher and to telephone him later in the day with a progress report.

56.     Ms. Fay understood Mr. Bedard's use of the term "rework" to constitute an instruction to find a way to increase the originally calculated ROEs for the Product's early years.

57.    As instructed by Mr. Bedard, Ms. Fay and her team of actuaries were able to rework the GAAP ROE Trajectory, resulting in an apparent increase in the Product's first year ROE from 7.0% to 8.0%.

58.    Ms. Fay believed that the assumptions and calculations that she and her team of actuaries were required to use to produce the 8.0% first-year ROE were inconsistent with the accepted actuarial and accounting methods that they had previously used.

59.    The American Academy of Actuaries Code of Conduct states, in relevant part:

> An Actuary shall act honestly, with integrity and competence, and in a manner to fulfill the profession's responsibility to the public and to uphold the reputation of the actuarial profession.
>
> . . .
>
> An Actuary shall not engage in any professional conduct involving dishonesty, fraud, deceit, or misrepresentation or commit any act that reflects adversely on the actuarial profession.
>
> . . .
>
> An Actuary who performs Actuarial Services shall take reasonable steps to ensure that such services are not used to mislead other parties.

60.    Two actuaries who worked with Ms. Fay on the revised GAAP ROE Trajectory told Ms. Fay that they were uncomfortable with the revised calculations.  They told her that their discomfort was based, in part, on the fact that the revised calculations were inconsistent with the prescribed actuarial guidelines.  They also told her that their discomfort was based on their belief that the revised calculations would not hold up under actuarial scrutiny or pass muster with an independent auditor.

61.    Based on her actuaries' opinions and her own substantial experience, Ms. Fay reasonably and in good faith believed that the revised GAAP ROE Trajectory did not comport

with the American Academy of Actuaries Code of Conduct; one or more Actuarial Standards of Practice, as promulgated by the Actuarial Standards Board; and/or GAAP.

62.     At approximately 3:30 p.m., as instructed, Ms. Fay emailed the revised GAAP ROE Trajectory, including the newly-revised first-year ROE of 8.0%, to Mr. Bedard.

63.     Later that same day, at approximately 4:45 p.m., Mr. Bedard sent Ms. Fay an email asking her to call him, which she did.

64.     On that telephone call, Mr. Bedard told Ms. Fay that Ms. Beams was still dissatisfied with the 8.0% first-year ROE.  Mr. Bedard told Ms. Fay that the first-year ROE needed to be at least 8.4%.  (ING's weighted average cost of capital was 8.4%.)  Mr. Bedard then instructed Ms. Fay to "just plug it," which would satisfy Ms. Beams.  Ms. Fay understood Mr. Bedard to be instructing her to state in writing that the first-year ROE would be 8.4%, even though she did not have a good faith, reasonable belief that it would be.  During the telephone call, Mr. Bedard also stated to Ms. Fay: "I hope that we are not on a recorded line."  In response to his instructions, Ms. Fay told Mr. Bedard that she could not simply manipulate the calculations to achieve a first-year ROE of 8.4% and that she would not do it.

65.     Following her telephone conversation with Mr. Bedard, Ms. Fay had a telephone conversation with two members of her actuarial team during which she told them that Ms. Beams wanted them to rework the GAAP ROE Trajectory yet again in order to produce a first-year ROE of 8.4%.  The actuaries responded, in substance, that the request was improper.  They told Ms. Fay that they had already stretched the boundaries of the accepted actuarial methods as much as possible and that they could not believe what they were being told to do.

66.     One actuary on Ms. Fay's team also stated, in substance, that the ROE for ING's existing annuities, the Secure Index Annuity series, was less than 8.0% in its early years, so it was neither logical nor credible to expect the Lifetime Income Annuity to have better results.

67.     Nonetheless, based on Ms. Beams's orders, the actuaries (under Ms. Fay's supervision) reworked the GAAP ROE Trajectory again to produce a first-year ROE of 8.3%. The actuaries told Ms. Fay, in substance, that the 8.0% first-year ROE was already indefensible under accepted actuarial methods and would not pass muster with an independent auditor.  Even by applying inappropriate assumptions and methodologies, the actuaries still could not reach a first-year ROE of 8.4%, as Ms. Fay had been instructed to produce.

68.     One of these actuaries emailed Ms. Fay attaching the new GAAP ROE Trajectory, which the actuary had titled "Copy of Aggregate GAAP _v2."  The email stated:  "While seeming reasonable, all these numbers are still estimates and do not necessarily reflect reality. Regardless, if Maliz [Beams] wants us to manage to an estimated 8.3% ROE or better for the 1st year, then we will do so."

69.     Ms. Fay subsequently forwarded this email to Mr. Bedard.

70.     Later, Mr. Bedard told Ms. Fay to tell the actuary who sent the new GAAP ROE Trajectory that she had "better be careful" with what she put in writing, including emails.

71.     On Monday, February 25, 2013, while Mr. Bedard and Ms. Fay were travelling on business, he asked her if she and her team of actuaries had increased the ROE as he had instructed on the previous Friday.  Ms. Fay told Mr. Bedard that she did not agree that "plugging it" was appropriate.  Mr. Bedard explained that "plugging" a number could be characterized as merely "rounding."  He said that it would just be an internal entry in the company's files.

72.     On Friday, March 1, 2013, Ms. Fay showed Mr. Bedard her actuarial team's revised calculations and the revised first-year ROE of 8.3%.  Ms. Fay reiterated to Mr. Bedard, in substance, that she and her actuarial team believed that the 8.3% first-year ROE was unrealistically high and not supported by the required actuarial methodology.  As an alternative, Ms. Fay suggested to Mr. Bedard that both the 8.0% and the 8.3% figures be reflected in the ROE memorandum to ensure clarity and avoid misleading the reader.  Mr. Bedard rejected Ms. Fay's suggestion.

73.     Later in the same meeting, Mr. Bedard asked Ms. Fay to rewrite the ROE memorandum that she had previously submitted on February 15 to incorporate a first-year ROE of 8.3%.  Ms. Fay responded that she would work on rewriting the memorandum.

74.     Ms. Fay did not immediately rewrite the memorandum because she remained uncomfortable with an ROE that she was instructed to "plug in."

75.     On Monday, March 4, 2013, Mr. Bedard asked Ms. Fay about the status of the revised memorandum.  She responded that she was still working on it.

76.     That same day, ING issued a press release announcing the launch of the Product.

77.     Following the issuance of the press release, on March 4, 2013, ING's Chief Financial Officer, Ewout Steenbergen, emailed two of his subordinates to inquire about the approval process for the Product.

78.     Upon information and belief, in a departure from ING's ordinary protocol, neither Mr. Steenbergen nor his superior, ING's Chief Executive Officer Rodney Martin, had approved the issuance of the Product.

79.     In response to Mr. Steenbergen's inquiry, one of his subordinates, Christina Hack, emailed Ms. Fay and a risk manager for ING Annuities, Thomas Hanson, with a copy to

Mr. Bedard.  Ms. Hack wrote: "Apparently our approach of not going to the OCEO" — meaning

the Office of the Chief Executive Officer, which included Mr. Steenbergen — "didn't quite catch

everyone."

      80.    Mr. Bedard replied to Ms. Hack's email (with a copy to Ms. Fay) as follows:

> We vetted this at length amongst ourselves and with Mike [Smith] and
> Maliz [Beams].  We had put a memo together that laid out the financial
> and strategic rationale for moving forward with this product.  The
> financials ended in such a place that we were comfortable not needing to
> go to OCEO which Mike and Maliz agreed with.  Mary [Fay] is updating
> the memo for a few minor changes that happened a week ago (we did not
> get to updating last week due to the sales conference).  My suggestion
> would be once we get the updated memo over the next day or two, we
> shoot that to Ewout.  I think that should do the trick but if we need to
> discuss with him at that point we certainly can.  Maybe you go back to
> him with that game plan ??  [sic.]  Please let me know.

      81.    The following morning, Tuesday, March 5, 2013, Ms. Fay responded to

Mr. Bedard's email to Ms. Hack.  She reminded Mr. Bedard that they had been "asked by

[Ms. Beams] for a hypothetical view that could result in higher early year irr [sic]" — a term that

she used interchangeably with ROE.  She said the higher early year ROE was only "for our files"

— meaning ING's internal files.  She recommended that they "should omit this view from the

revised memo[random]."

      82.    Mr. Bedard responded by email approximately 11 minutes later.  He told Ms. Fay

that "we just make the couple minor tweaks we discussed on Friday of last week."  He added:

> We do need the revised projection though that shows year 1 in that 8.2%
> range.  I don't think you need to get into the adjustments we made to the
> bands/death benefits etc. on that infamous Friday.  Just the minor tweaks
> to the memo and the updated projection should be fine.  We have gotten a
> bunch of inquiries from folks on the announcement. . . . [I]f we could get
> the memo done today so we could get in the hands of a couple folks I
> think that would be good.

83.     Ms. Fay understood Mr. Bedard's email to be an order from Mr. Bedard for her to leave the February 21, 2013, memorandum largely unchanged, but to increase the first-year ROE number to the "8.2% range."

84.     Ms. Fay followed Mr. Bedard's explicit instructions and rewrote the memorandum to include both the 8.0% and 8.3% ROE scenarios.

85.     Later that same day, Ms. Fay hand-delivered a draft of the revised memorandum to Mr. Bedard in his office.  The draft was dated March 5, 2013.

86.     Mr. Bedard changed Ms. Fay's draft revised memorandum in at least two substantive respects.

87.     First, Mr. Bedard removed the 8.0% ROE scenario from the memorandum entirely, leaving only the 8.3% scenario.  Drawing an arrow to that scenario, Mr. Bedard wrote: "Go with this one."

88.     Ms. Fay told Mr. Bedard that she was very uncomfortable with the 8.3% ROE scenario.  She told him that her team of actuaries was very uncomfortable with the 8.3% ROE scenario.  And she told him that the 8.3% ROE scenario was only run for ING's internal files, as instructed by Mr. Bedard and Ms. Beams.  Mr. Bedard responded, in essence, that Ms. Fay needed to proceed with 8.3% ROE scenario.

89.     Second, Mr. Bedard crossed out the date of authorship on the memorandum (which was March 5, 2013) and backdated the memorandum to February 25, 2013, thus making it appear as if the 8.3% ROE calculation had been memorialized and approved prior to the press release announcing the launch of the Product.

90.     Ms. Fay told Mr. Bedard that the memorandum should not be backdated. Mr. Bedard attempted to rationalize the backdating by saying that the revised memorandum would have been issued earlier if the team had not had a sales meeting the prior week.

91.     Mr. Bedard then told Ms. Fay that Ms. Beams wanted the revised memorandum finalized and sent that same night.  Ms. Fay responded that it was after 7 p.m. and she would revise and deliver it to Mr. Bedard the next morning, March 6, 2013.

92.     The following morning, March 6, 2013, at or about 8:26 a.m., Ms. Fay emailed Mr. Hanson, a risk manager for ING Annuities.  She wrote to Mr. Hanson that: "[D]ave [Bedard] has instructed me to use scenario 2," meaning the 8.3% ROE scenario.  "[A]re you ok with that?"

93.     The reason that Ms. Fay wrote this email to Mr. Hanson was to cover herself in the event that she was criticized, disciplined, or investigated for promulgating a memorandum that utilized an ROE calculation methodology that she believed was improper, misleading, and — if disclosed to potential investors in Voya — illegal.

94.     Mr. Hanson emailed Ms. Fay approximately 20 minutes later that he was "OK to go with scenario 2."  He further wrote that: "we should ask Tom J" — meaning Thomas Jaros, Mr. Hanson's subordinate — "to validate the numbers if he hasn't already."

95.     At approximately 10 a.m., Ms. Fay hand-delivered the revised memorandum to Mr. Bedard in his office.  The revised memorandum incorporated all of the changes Mr. Bedard had instructed Ms. Fay to make the previous day.

96.     Ms. Fay reiterated to Mr. Bedard that she objected to what he was doing, saying: "I have been uncomfortable, [I] did not sleep at night, and [I] don't fuck around with numbers, and I don't want us to have issues over this."

16

97.     It was very unusual for Ms. Fay to use profanity, but she was frightened because she had been instructed to reach a particular result and the only way to reach that result was to depart from the correct actuarial methodology.  Accordingly, Ms. Fay wanted to be as emphatic as possible about her objection.

98.     Mr. Bedard responded: "Maliz [Beams] wants the higher numbers."  Ms. Fay said that this was a critical time for ING, with an initial public offering about to occur, and that she would not compromise her integrity.  Mr. Bedard told Ms. Fay that he spoke with Ms. Beams the previous night; that she wanted the higher numbers; and that the memorandum should go out "right away."  Ms. Fay returned to her office.

99.     At 10:43 a.m., Ms. Fay emailed Mr. Jaros the memorandum as revised by Mr. Bedard, along with ROE scenario 2, which reflected the first-year ROE of 8.3%.

100.     At 10:44 a.m., after Mr. Jaros had had approximately one minute to review what Ms. Fay had sent him, he spoke with Ms. Fay by telephone.

101.     Two minutes later, at 10:46 a.m., Ms. Fay sent herself an email to memorialize her conversation with Mr. Jaros.  She wrote that she "[s]poke with Thomas Jaros at 10:44 today; he didn't see anything unusual or odd/different with this methodology.  Nothing unreasonable."

102.     The reason that Ms. Fay wrote this email to herself was to establish that she had cover in the event that she was questioned about the conduct to which she had forcefully objected.

103.     Later that day, Ms. Fay emailed the memorandum to Ms. Beams, Mr. Smith, and Mr. Bedard, backdated to February 25, 2013, as instructed by Mr. Bedard.  The memorandum included only the 8.3% ROE scenario, also as Mr. Bedard had instructed.

17

**E.    In Response to Ms. Fay's Consistent Objections to Manipulating Her ROE Calculations, ING's Senior Leadership Marginalizes Her.**

104.    Beginning on or about March 7, 2013, immediately after Ms. Fay had consistently protested the improper manipulation of the ROE on the Lifetime Income Annuity, ING's senior leadership initiated a campaign to marginalize her.  Some examples of ING's marginalization of Ms. Fay were: she was excluded from events and meetings, including Annuities strategy meetings, product strategy meetings, distribution strategy meetings, broker trips, incentive/award trips, meetings with senior leaders (including Ms. Beams and Mr. Smith), and project prioritization meetings, all of which were meetings and events to which she had previously been invited and which she had attended, as well as social meetings, such as business dinners, to which she had previously been invited; her invitations to lunches and after-hours meetings with senior ING leaders stopped arriving; and the personal interest that Mr. Smith and Ms. Beams, in particular, had previously demonstrated in her career disappeared.

**(1)    Ms. Fay's 2012 Performance Review**

105.    On March 7, 2013, Ms. Fay was emailed her 2012 annual performance review. Shortly thereafter, she was telephoned by Ms. Beams and a representative from ING human resources to discuss the review.

106.    The written performance review contained only five short paragraphs.  The review did not follow ING's electronic template for performance reviews, as was standard protocol within ING.

107.    One paragraph of the review stated:

> From a development standpoint, you need to become more familiar with
> financial statements and the linkages between product actions/designs and
> near-term financial results.  This will help you be more effective as a
> product head and help be better prepared for the next step in your career.

18

108.    Ms. Fay understood the statement concerning "near-term financial results" to refer to the ROE calculations for the early years of the Lifetime Income Annuity.  In fact, the Lifetime Income Annuity was the only new product that Ms. Fay had worked on in the previous year.

109.    When Ms. Fay asked Ms. Beams about this particular feedback, Ms. Beams told Ms. Fay, in substance, that Ms. Beams was "disappointed in the economics" of the Product and that Ms. Fay had missed a "big opportunity."  Ms. Beams added that Ms. Fay did not implement the appropriate "financial structure around the launch" of the Product.

110.    Ms. Beams later said that Ms. Fay had a lot of "white noise" around her and needed to "wipe it out."

111.    Ms. Fay understood this statement about "white noise" to be a reference to her repeated resistance and objections to being instructed to manipulate the ROE calculations for the Product in order to reach a specific pre-determined ROE as mandated by ING's senior management.

### (2)    Crossroads Capital Group

112.    In January 2012, soon after she joined ING, Ms. Fay initiated a relationship between ING and Crossroads Capital Group ("Crossroads"), a firm that provided investment and advisory services for public, non-traded Real Estate Investment Trusts ("REITs") and other alternative investments.  The relationship with Crossroads represented a new distribution and marketing opportunity for ING Annuities.

113.    Ms. Fay was the key architect, initiator, and strategy developer for the relationship, and she worked closely with Crossroads to develop and foster the business relationship between Crossroads and ING.

114.    In May 2013, shortly after Ms. Fay had opposed Ms. Beams's and/or Mr. Smith's instructions — as communicated to her by Mr. Bedard — to artificially increase the ROE on the Lifetime Income Annuity, Mr. Bedard removed the Crossroads project from Ms. Fay's responsibilities.  Mr. Bedard instead assigned the project to Chad Tope, the Sales Leader for ING Annuities.

115.    Under the circumstances — particularly that Ms. Fay had fostered the project based on a preexisting personal relationship and that Ms. Fay had worked successfully on the project for nearly 18 months — there was no reason for ING to transfer the responsibility for the project away from her.

116.    Upon information and belief, Mr. Tope did not engage in any protected activity under the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6(h)(1)(A), or the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A(a)(1)(c).

117.    From May to November 2013, ING senior management only permitted Ms. Fay to have sporadic involvement with the Crossroads project.  Although she was included in some meetings that required product consultations, Ms. Fay was excluded from meetings with ING senior management or Crossroads principals.  She was removed from distribution lists, and she was only asked for input offline, rather than in the meetings.

118.    In November 2013, when ING senior management presented the project to ING's Chief Executive Officer for approval of the Crossroads project, Ms. Fay was not invited or even informed.

### (3)    Determination of Interest Rates

119.    One component of Ms. Fay's responsibilities at ING involved the biweekly setting of interest rates for all ING Annuities products.  The elaborate process of setting interest

rates for all ING Annuities products culminated in the presentation of recommendations to ING's senior management.  This presentation occurred every two weeks.

120.    Prior to each of these biweekly presentations to senior management, the Annuities working team — Finance (represented by Mun Kurup), Risk (represented by Arthur Wallace), Sales (represented by Chad Tope), and Product (represented by Ms. Fay) — met to discuss and agree upon recommendations.

121.    As the team's leader, Ms. Fay had ultimate decision-making authority, and it was her responsibility to present each of the team's recommendations to senior management.

122.    Prior to the spring of 2013, ING's senior management always substantially approved the team's recommendations, as presented by Ms. Fay.  The environment of these presentations was consistently collegial.

123.    Starting in the second quarter of 2013, however — shortly after Ms. Fay's consistently strong resistance to the instructions that she simply "plug" inflated ROE numbers for the Lifetime Income Annuity, and as part of the continuing marginalization of Ms. Fay — this collegiality disappeared.

124.    Specifically, members of ING's senior management, including Mr. Smith, who had previously followed Ms. Fay's team's recommendations, began to question the recommendations.

125.    The questions to Ms. Fay were presented in a hostile manner, in sharp contrast to the welcome environment that had prevailed prior to the launch of the Product.

126.    These challenges to Ms. Fay's recommendations on behalf of the Annuities working team occurred on approximately one dozen occasions in the second, third, and fourth quarters of 2013 and persisted until Ms. Fay's termination on November 1, 2013.

### (4)    Allstate

127.    In July 2013, the Allstate insurance company asked ING to respond to a request for proposals to provide it with a product known as Index Annuities.

128.    Inasmuch as Allstate indicated that product and product differentiation, as well as distribution strategy (through Crossroads), would be key to securing the deal, Ms. Fay's product expertise was essential.  Nevertheless, Mr. Bedard assigned the project to Chad Tope.

129.    Ms. Fay remained involved in the project to a limited degree, participating in some conference calls and providing product information.  However, it was made clear to her that she was not a welcome member of the team.

130.    At a September 2013 meeting in Chicago, for example, the ING team stayed at the Marriott and had dinner together.  Ms. Fay was placed at a different hotel and was not included in the dinner meeting.

131.    In October 2013, when ING ultimately won the Allstate business, Ms. Beams issued an announcement congratulating the ING team.  She acknowledged all of the principal participants in the deal.  Pointedly, she omitted Ms. Fay.

### (5)    Replacement of Head of Annuities

132.    In September 2013, David Bedard resigned as Head of Annuities at ING.  Chad Tope was named interim Head of Annuities and assigned the duties previously assigned to Mr. Bedard.  Mr. Tope retained his title of President of Annuity and Asset Sales.

133.    Ms. Fay — who, in July 2012, had been publicly introduced as the new Head of Annuities — was neither consulted about the selection of Mr. Tope, nor was she informed of his selection prior to the formal announcement.

134.    Prior to Mr. Tope being named and after Ms. Fay learned that Mr. Bedard was leaving, Ms. Fay expressed to Jamie Ohl, ING's President of Tax-Exempt Markets and a direct report to Ms. Beams, that she was still interested in the position of Head of Annuities. Specifically, Ms. Fay said to Ms. Ohl: "For the record, I'd still be interested in that job."  When Ms. Fay said this to Ms. Ohl, she believed that Ms. Ohl would tell Ms. Beams about Ms. Fay's interest.

135.    Shortly after the announcement of Mr. Tope's interim appointment, on or about October 23, 2013, a Retirement Leadership conference telephone call to all employees was initiated by Ms. Beams.  She selected Mr. Tope to present the Product portion of the call, even though Ms. Fay was the Head of Product and was present with Mr. Tope during the conference call.  Ms. Fay was not acknowledged by Ms. Beams and was interrupted when she attempted to contribute to the discussion.

136.    Following Mr. Tope's appointment as Interim Head of Annuities, the Annuities Leadership team met in Des Moines on October 29, 2013, just three days before Ms. Fay was terminated.

137.    Ms. Fay attended the meeting.

138.    As Chair of the meeting, Mr. Tope established the agenda.  Each attendee presented his or her priorities for the year.  Mr. Tope placed Ms. Fay's presentation regarding Product at the end of the meeting and the time for the meeting ended before Ms. Fay was permitted to present.

139.    Product was — as it always was in such meetings — the central agenda item of the meeting's business.  Several meeting attendees expressed to Ms. Fay that the meeting was a

waste of time and money without hearing from Product, around which all other components of Annuities revolved.

**F.**     **ING Terminates Ms. Fay Without Warning and for Pretextual Reasons.**

140.     Upon information and belief, in or about March and April 2013, immediately following Ms. Fay's strongly expressed opposition in February and March to the instructions that she manipulate the ROE calculations for the Lifetime Income Annuity in order to reach a specific pre-determined ROE, Mr. Bedard began to interview potential replacements for Ms. Fay.

141.     One person Mr. Bedard interviewed was Mun Kurup.

142.     On June 20, 2013, Mark Kaye, the Chief Financial Officer of ING Retirement Solutions and a direct report of Ms. Beams, formally announced that Mr. Kurup would join ING Retirement Solutions as Head of Annuities Finance, effective July 1, 2013.

143.     Mr. Kurup had previously worked for ING in South Korea and was moved to the United States to join ING Retirement Solutions.

144.     From the time of his arrival in the United States in July 2013, Mr. Kurup shadowed Ms. Fay in meetings and monitored her progress and activities on key projects.

145.     Upon his arrival in the United States in July 2013, Mr. Kurup replaced Ms. Fay as the lead in Product presentations to ING's senior management, even though Ms. Fay was still nominally the Head of Annuity Product Management.

146.     Shortly after his arrival in the United States in July 2013, Mr. Kurup replaced Ms. Fay on key projects on which she had previously been a principal, including the Crossroads project — which Ms. Fay had originally initiated and brought to ING — and the Allstate project.

147.     For example, on July 30, 2013, Mr. Bedard emailed to Ms. Fay that he was "all set on Crossroads" and that "getting Mun involved ha[d] been very helpful in sorting things out and moving along."

148.     Mr. Kurup's role as Head of Annuities Finance did not justify any significant involvement by Mr. Kurup in the Crossroads project.  Rather, Mr. Bedard got Mr. Kurup involved in the project in order to replace Ms. Fay.

149.     Upon information and belief, ING transferred Mr. Kurup to the United States from South Korea in July 2013 to replace Ms. Fay in ING Annuities.

150.     On November 1, 2013, without any prior warning, Ms. Fay was summarily terminated from her employment at ING.

151.     Mr. Kaye told Ms. Fay that her position had been "eliminated."

152.     An attachment to Ms. Fay's termination letter also stated that her position as "Head of Annuity Product Management" had been "[e]liminated."

153.     Ms. Fay's position was one whose functions were and are central to ING's Annuities business.  Its elimination would be inconsistent with ING's business model.

154.     According to ING's subsequent explanation, Ms. Fay's responsibilities with respect to Annuities were assumed by Mun Kurup, for whom a new position overseeing Annuities Product Development, Pricing, and Strategy was created.

155.     Upon information and belief, Mr. Kurup did not engage in any protected activity under the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6(h)(1)(A), or the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A(a)(1)(c).

156.     As the result of her termination, Ms. Fay has suffered and will continue to suffer economic and non-economic damages.

## VI.   CLAIMS FOR RELIEF

### COUNT ONE

### Violation of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6(h)(1)(A)

157.   The plaintiff incorporates by reference each and every allegation in paragraphs 1 through 156 above.

158.   The plaintiff made disclosures to senior management of the defendant that were protected by the Sarbanes-Oxley Act of 2002.

159.   The plaintiff had an objectively and subjectively reasonable belief that the conduct that she disclosed was a violation of the rules and regulations of the Securities and Exchange Commission, as well as federal laws prohibiting fraud against shareholders, including but not limited to 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

160.   The defendant retaliated against the plaintiff for making disclosures to the defendant's senior management that were protected by the Sarbanes-Oxley Act of 2002, by terminating the plaintiff because of her disclosures.

## COUNT TWO

### Violation of the Sarbanes-Oxley Act of 2002,
### 18 U.S.C. § 1514A(a)(1)(c)

161.     The plaintiff incorporates by reference each and every allegation in paragraphs 1 through 156 above.

162.     The plaintiff reported conduct to her superiors which she objectively and subjectively reasonably believed was a violation of the rules and regulations of the Securities and Exchange Commission, as well as federal laws prohibiting fraud against shareholders, including but not limited to 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

163.     The plaintiff reported this conduct to one or more persons with supervisory authority over her.

164.     The defendant was aware of the plaintiff's reports concerning its conduct.

165.     The plaintiff's reports regarding this conduct, which she reasonably believed could be illegal, were a contributing factor in the defendant's decision to terminate her employment.

## COUNT THREE

### Violation of Connecticut's Free Speech Anti-Retaliation Statute,
### Conn. Gen. Stat. § 31-51q

166.     The plaintiff incorporates by reference each and every allegation in paragraphs 1 through 156 above.

167.     The defendant was the plaintiff's employer within the meaning of § 31-51q.

168.     The defendant discharged the plaintiff on account of her exercise of rights guaranteed to her by section 4 of article first of the Connecticut Constitution.

169.    The plaintiff's exercise of her protected constitutional rights did not substantially or materially interfere with her bona fide job performance or the working relationship between her and the defendant.

170.    The defendant's discharge of the plaintiff was willful or done in reckless disregard for her rights under § 31-51q.

* * *

WHEREFORE, the plaintiff respectfully requests that this Court empanel a jury to hear her claims and order the following relief:

a.    Reinstatement with the same seniority she would have had but for ING's retaliation, under 15 U.S.C. § 78u-6(h)(1)(C)(i) and 18 U.S.C. § 1514A(c)(2)(A), or front pay, in the event that reinstatement is or becomes impossible, impractical, or inappropriate;

b.    An award of two times back pay, with interest, under 15 U.S.C. § 78u-6(h)(1)(C)(ii);

c.    An award of back pay, with interest, under 18 U.S.C. § 1514A(c)(2)(B);

d.    An award of non-economic compensatory damages under 18 U.S.C. § 1514A(c)(2);

e.    An award of back pay, front pay, and non-economic compensatory damages under Conn. Gen. Stat. § 31-51q;

f.    An award of attorneys' fees and costs, under 15 U.S.C. § 78u-6(h)(1)(C)(iii); 18 U.S.C. § 1514A(c)(2)(C); and Conn. Gen. Stat. § 31-51q;

g.    An award of punitive damages, under Conn. Gen. Stat. § 31-51q; and

h.    Any other remedy that may appear to be just and proper.

**RESPECTFULLY SUBMITTED,**
**THE PLAINTIFF**

By:      */s/ Ethan Levin-Epstein*
Joseph D. Garrison  (ct04132)
Ethan Levin-Epstein  (ct01566)
Joshua R. Goodbaum  (ct28834)
GARRISON, LEVIN-EPSTEIN, FITZGERALD
    & PIRROTTI, P.C.
405 Orange Street
New Haven, CT  06511
Tel:    (203) 777-4425
Fax:    (203) 776-3965
elevin-epstein@garrisonlaw.com
jgarrison@garrisonlaw.com
jgoodbaum@garrisonlaw.com

COUNSEL FOR THE PLAINTIFF